Filed 3/27/14  In re Steven P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re STEVEN P., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH & HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>RICHARD P.,<br><br>        Defendant and Appellant. | A139495<br><br>(Napa County<br>Super. Ct. No. JV 17163) |

Noncustodial father Richard P. appeals from an order of the juvenile court terminating his reunification services at the 12-month review.  He asserts the following four arguments:  (1) the juvenile court's finding that Napa County Health & Human Services (the Department) provided reasonable services was unsupported by substantial evidence; (2) the court's finding of detriment was unsupported by substantial evidence; (3) the court neglected to advise him at the six-month review hearing that failure to reunify might lead to the termination of his parental rights; and (4) he received ineffective assistance of counsel.

We find Richard's first contention well taken.  The Department was aware as far back as the time of detention that Richard lacked stable and suitable housing.  It identified obtaining stable housing as a component of his reunification plan.  It confirmed

1

at the six-moth review that, while Richard was in compliance with most other requirements of his plan, he still struggled with housing. Despite that it repeatedly identified Richard's lack of stable housing as a critical barrier to reunification, the Department offered him no assistance whatsoever in remedying this problem. We therefore reverse the juvenile court's order terminating reunification services at the 12-month review.

## BACKGROUND

### Detention

This Welfare and Institutions Code section 300[1] dependency proceeding commenced in June 2012, after a probation search of the home where then three-year-old Steven P. lived with his mother Melissa B. and numerous other relatives uncovered drugs, knives, and toxic substances within easy reach of Steven and his half-siblings. Melissa, who was under the influence at the time and admitted to methamphetamine use the previous day, was arrested for drug possession and child endangerment. Steven was taken into protective custody and placed in the home of a relative.[2]

On June 18, 2012, the Department filed a section 300 petition, alleging failure to protect Steven within the meaning of subdivision (b). At the detention hearing the next day, the court was informed that Melissa had full physical and legal custody of Steven due to a domestic violence restraining order issued against Richard. Melissa and Richard submitted on detention, and the court ordered Steven detained.

### Jurisdiction

In the July 11, 2012 jurisdiction report, the social worker described a June 26 interview she had with Richard. Richard had discussed his troubled relationship with Melissa, noting they had been together for almost four years but were separated at that time. According to Richard, Melissa was clean when they first got together, but later

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

[2] Ryan J., the father of two of Melissa's four children, was also present at the time of the search. He, too, was arrested. We omit further details concerning Melissa and Ryan except where relevant to the issues before us.

2

began using again, including when she was pregnant. He told the social worker he had called the Department and the police on numerous occasions to report concerns about Steven's safety while in Melissa's care, but he was eventually told he would be arrested for harassment if he continued to call. He also acknowledged that Melissa had a restraining order against him because she claimed he had beaten her up but, in fact, it was he who had been punched in the face by Ryan's brother. They had a mediated visitation plan that afforded him weekend visits, including overnights.

The Department noted that in October 2010, it had received two general neglect referrals regarding Steven, both alleging that Richard had left the child with "random people" and was using and selling drugs. One referral additionally alleged that Richard allowed homeless people and drug addicts to sleep on mattresses on the floor of his home and that Steven had a bruise on his head and severe diaper rash. The first referral was investigated and deemed unfounded, the second evaluated out at intake. The Department had also received 12 referrals alleging neglect or caretaker absence/incapacity by Melissa between 1999 and 2012.

As to the parents' criminal history, the Department noted that Melissa's was lengthy, and included an October 2009 conviction for inflicting corporal injury on a spouse (presumably Richard). Richard, on the other hand, had only a 2011 conviction for misdemeanor driving on a suspended license.

The Department confirmed that Melissa had been granted sole legal and physical custody of Steven because of a restraining order issued against Richard on March 29, 2012. As stated in the report, "[T]he situation surrounding this restraining order remains unclear as there is nothing in the father's criminal history that is connected to the restraining order. However, the Department is concerned that the Court issued a 5-year restraining order against the father and the father stated to the undersigned that he does not hit women. This issue requires further investigation which will take place prior to the Disposition hearing."

The Department concluded that Richard was not in a position to provide stability for Steven, as he frequently moved around and changed his telephone number and did not have a consistent employment history.

At the July 12 jurisdiction hearing, Richard and Melissa submitted on the petition, and the court sustained the allegations and took jurisdiction over Steven.

**Disposition**

In its July 25 disposition report, the Department reported that, according to Richard, he was staying with a friend's grandmother because none of his relatives would let him stay with them. He admitted he had "bounced from job to job" over the previous few years, which he blamed on Melissa. He believed he had a negative reputation because he was surrounded by "thieves and drug addicts." According to the Department, "The father understands that he does not have a home for Steven. He wants to obtain appropriate housing, a stable and consistent job and support for his parenting."

The Department also related Richard's version of the incident that lead to the restraining order, as follows: " 'I was under the suspicion that Melissa and her mom were going to take the house from me.' The maternal grandmother 'hadn't paid her bills and was about to lose her home. I don't agree with things she does. She is not a very nice person. She is a liar, manipulative and knows how to work the system. She coached my wife to tell the cops I hit her. She was on the floor yelling while Melissa was on the phone with 911.' The father continued, 'I had an assault charge the day before because I brushed up against her mom in the hall. We got into an argument and they called the cops. I told them to "get the fuck out of my house." She [maternal grandmother] didn't like it. Melissa told Ryan's . . . family I threatened to slit the kids' throats.' The father said, 'Ryan's brother and father showed up and tried to force their way into the house. They threatened to knock me out for how I spoke to their mother. Ryan's dad put his foot in my door as I was trying to close it.' The father said, 'I hate physical violence toward children. Ryan's brother hit me. I almost fell over on my son. I was furious. I went outside [in case there was a fight.] I finally got back inside and locked the door and called 911. I went to another part of the house and hit a door. I believe violence in front

4

of children just continues with more violence.'  The father said that he went straight to bed following the incident and the next day 'the cops showed up with a move out order.' "

The report also contained Melissa's description of her history with Richard and his purported drug use, which the Department related as follows:  " 'He and I were using together for about a year.  He will say he has never used drugs, but that's not true.'  The mother and father got married and she 'got a dirty test through probation' after which she 'cleaned up' and had her fourth child, Steven P. in 2009.  After Steven's birth the mother 'relapsed again.'  She said, 'Richard has always had a problem with pain pills.  He was still using them when I was trying to be clean.'  The mother said that she 'relapsed two or three times' with the father [*sic*] pills and that he 'was using steadily' during that time."

Melissa also expressed concerns about Steven being placed with Richard:  " 'The thought of Steven going to live with Richie (the father) scares the hell out of me [because he] cannot control his temper.'  She added, 'I have doors in my house that are filled with holes.'  She said, 'Right now he [Steven] would not be safe [with Richie] and I would rather him be in foster care.'  The mother stated that the father 'flips out' and 'he flips out so badly he scares people.  He has put his hands on me and my mom.  He pulled my hair. He hit me in front of Steven.  He hit me over the head with a toy.'  The mother then said that the father loses control like this 'when he doesn't have his pain pills.' "

The Department advised against placing Steven with Richard, stating:  "Richard P. is the non-custodial parent in this Dependency.  He stated that he does not have a suitable home to which he can take Steven.  In addition, the Court issued a five year restraining order against the father in April 2012 based on reported domestic violence between him and the mother.  The father has questionable associations with people he describes as 'thieves and drug addicts' which pose a risk of harm to Steven.  In addition, there are numerous conflicting reports that state that the father does in fact use drugs or has in the recent past.  The father does not have stable employment or reliable transportation."

The Department recommended reunification services for both parents.  Richard's proposed reunification plan required him to obtain and maintain a stable, safe, and

5

sanitary place for Steven to live; stay free from illegal drugs; participate in counseling or therapy to address issues of substance abuse and uncontrolled anger; complete a drug and alcohol intake assessment and comply with all recommendations; attend three weekly NA/AA meetings; submit to random drug testing; and participate in the Substance Abuse Recovery Management System (SARMS).

The disposition hearing was held on July 26. Richard's counsel advised the court that the Department had agreed to modifications to Richard's case plan that would require him to complete a 52-week anger management program, instead of counseling or therapy. The Department also agreed to defer the NA/AA and SARMS requirements, pending the results of a drug and alcohol assessment. Richard would, in the interim, submit to substance abuse testing. After counsel for the Department confirmed its agreement with these modifications, the court adopted the modified plan. It also confirmed that while Richard's participation in SARMS was deferred, Melissa was required to participate in the program, scheduling a SARMS hearing for August 21, a date subsequently continued to September 18.

**SARMS Hearings**

Over the months following the disposition hearing, there was significant confusion about Richard's participation in SARMS and substance abuse services. At the September 18 SARMS hearing, the social worker incorrectly informed the court that Richard was required to attend three NA meetings a week but that he had not submitted NA attendance sheets for the reporting period. He had, however, participated in a drug and alcohol assessment, which resulted in a no-treatment-needed recommendation, and he had submitted two negative drug tests. There followed a lengthy discussion about what was required of Richard in terms of substance abuse treatment, concluding with the court's proposal that "Mr. P. continue in our SARMS program, continuing to test under the obligation to attend his NA meetings, and then we will just have him come back and see how it goes. . . ."

The confusion persisted at the SARMS hearings in October and November, with the social worker continuing to insist that Richard was required to attend three 12-step

6

meetings a week, a requirement with which he was not in compliance.[3] At the December 18 SARMS hearing, Richard was finally discharged from SARMS—which he was never, under his case plan, required to complete—upon the social worker's representation that his alcohol and drug assessment had found no need for treatment and his tests had been negative. The social worker further represented that she would work to remove the NA/AA meeting requirement in Richard's case plan, but noted that he would still be subject to random drug testing. At the conclusion of the hearing, the court congratulated Richard "for doing everything you were supposed to do, for showing everyone you are not, in fact, using at all, and graduating from the SARMS program."

**Six-Month Review**

On December 27, the Department submitted a six-month review report, recommending continued reunification efforts for both parents. It represented that Richard was in compliance with many components of his reunification plan, including visitation, maintaining monthly contact with the social worker, participating in an anger management program, and completing a drug and alcohol assessment. He had submitted to random drug testing, with negative results, although he had missed four tests in the six-month reporting period.

Concerning substance abuse issues, the Department erroneously advised that Richard was not in compliance with the requirement that he attend three NA/AA meetings per week. It was further noted that he had graduated from SARMS and would no longer be required to attend the hearings—even though this was never a requirement of his case plan in the first place. The Department represented that it had "agreed to modify his case plan so that it reflects that he will no longer be asked to attend these meetings."

Significantly, the Department acknowledged that Richard was not in compliance with the housing component of his case plan. As the Department described it, "The

---

[3] Despite that his case plan, as modified, deferred his SARMS participation and the NA attendance requirement, Richard nevertheless attended some NA meetings during that time.

father continues to struggle in finding a permanent place to live. The father has stated that his family is not willing to help him because his child is in the Child Welfare system. The father has lived in two different places this reporting period and will move again shortly. The father was previously employed and the father stated that the restaurant owner went bankrupt and he had to find another job. Recently, the father has stated to the undersigned that he has been hired at a local restaurant in downtown Napa. The father has also stated that he is actively looking for an apartment to rent so that he can have a suitable and safe place for he and Steven to live in." In light of Richard's lack of suitable housing, the Department believed that it would be detrimental to return Steven to Richard's care at that time.

At the January 15, 2013 six-month review hearing, the court continued services to both parents, specifically finding that Richard had made moderate progress on his reunification plan, while Melissa had made minimal progress.

**12-Month Review**

Around the time of the six-month review, however, Richard stopped participating in his reunification plan. According to the record, he attended the six-month review hearing on January 15, 2013, but then lost contact with the Department until May 21, when he finally met with the social worker. In the June 19, 12-month status report, the social worker described their meeting as follows: "On 5/21/13, the undersigned met the father first face to face for the first time during this reporting period. The father reported going through a period of homelessness until recently moving in with his girlfriend in Vallejo. . . . . [¶] The father reported being terminated from his position as a cook in January 2013. Additionally, the father reported other social challenges that have interfered with his ability to be stable and remain in contact with the Department. The father reported dealing with an untreated illness of Depression which he characterized as, 'not getting enough sleep.' The father reported being financially unstable and that losing his job caused the termination of his cell phone service. The father added that his lack of transportation has prevented him from visiting his son and communicating with the Department."

8

In terms of "Detriment & Prognosis of Returning Child Home," the Department stated, "The father has only engaged with the undersigned once during this reporting period. The undersigned learned the father's phone service to be disconnected through multiple attempts of contacting the father. The undersigned made two unannounced home visits at the address provided by the father; however, during both attempts, the father's grandmother reported that the father does not reside at the address and that no relative has seen the father in months. The undersigned mailed two letters to this address requesting the father to contact the Department immediately; however, the father has yet to contact the Department. [¶] On 5/21/2013, the father came into the Department to discuss case planning with the undersigned. During that time, the father reported experiencing economical hardship which resulted in his lack of participation in case planning throughout this reporting period. The father's uncooperative behavior or lack of involvement with the Department suggests that the father is not dedicated to reunifying with Steven. The father has not made progress in his case plan and has been homeless for much of the reporting period. While the father reports he recently moved in with his girlfriend, it is unknown if this is a stable living environment. Further, the father has not visited Steven since December 2012 or made any attempt to contact or visit Steven since December 2012."

As to the specific requirements of the reunification plan, Richard was not in compliance with the visitation requirement, with his last visit having occurred on December 25, 2012, nearly six months prior. He was also out of compliance with most other requirements of his plan, having only completed the anger management class and the drug and alcohol assessment. He had missed five drug tests since the beginning of January, with the last missed test on February 21, 2013.[4] Accordingly, the Department recommended terminating Richard's services.

---

[4] As the social worker would later testify, the Department dropped Richard from the drug testing schedule since he had stopped testing and communicating with the Department.

Melissa, on the other hand, was being consistent in her visits and had completed all components of her reunification plan, other than maintaining a stable, safe, and sanitary place to live with her children, free from alcohol and illegal drugs. Consequently, the Department recommended extending her services for an additional six months.

On June 25, the matter came on for a 12-month review. At the outset of the hearing and at Richard's request, the court held a *Marsden*[5] hearing, following which it relieved Richard's counsel. It appointed new counsel, confirmed Richard's understanding that the Department was recommending termination of his services, and continued the 12-month review for two days.

At the continued hearing, the court found that Melissa had made substantial progress in alleviating the problems that led to the dependency proceeding and extended her reunification services. As to Richard, his newly-appointed counsel requested a contested hearing, which the court set for July 29.

**Contested 12-Month Review Hearing**

The contested hearing was held on July 29 as scheduled. Social worker Akisha Thomas—who had been handling Steven's case since January 2013—was the first to testify. Thomas testified that she had located Richard in the process of completing a due diligence investigation and, on May 21, he had come into the Department to meet with her. He told her he had lost his job, which caused depression and economic hardship, which in turn resulted in transportation problems and termination of his cell phone service. As a result, he had not contacted the Department or participated in visitation. Richard had also acknowledged that he did not have a suitable place for Steven to live, as he had been living with his father in Napa and his girlfriend in Vallejo off and on. He was employed, however, having started a new job one week prior. In light of Richard's transportation issues, Thomas had provided him with a bus pass so he could make it to his visitations.

---

[5] *People v. Marsden* (1970) 2 Cal.3d 118.

10

Thomas further testified that Richard failed to visit with Steven from December 25 until "just recently," when they had two supervised visits. This, according to Thomas, suggested he was not committed to his son and there was a lack of attachment or bonding between the two. And because Richard had not visited for nearly six months, Thomas had been unable to evaluate his parenting skills.

Thomas confirmed that Richard completed an anger management class in January 2013. Since May 21, he was also contacting the Department once per month as required. According to Thomas, however, Richard was not in compliance with the requirement that he engage in counseling once per week. She testified that she had provided Richard with "various resources," and it was up to him to "go out diligently and find a counselor," which he had not done.

Thomas confirmed that Richard missed four drug tests in the first reporting period (August to December) and five more since December. His last missed test was on February 21, 2013, after which he was taken off the schedule because he was no longer communicating with the Department. He did submit to a test in July—after he was back in touch with the Department—with a negative result. Thomas acknowledged on cross-examination that Richard had never tested positive, and the allegations of his drug use were never substantiated or documented.

Richard also testified. According to him, for the past two months he had been living in a "neat" and "clean" three-bedroom apartment in Vallejo with his girlfriend and her father, who was the property manager for the apartment complex. He was working in construction with a "100 percent" prospect for continued employment. He anticipated receiving a raise within the next month, as well as obtaining a health care plan for Steven and himself. Richard confirmed that he had no criminal history other than receiving a citation for driving on a suspended license.

Richard had last seen Steven at a "great" visit a few days before the hearing. According to Richard, Steven was happy when he came to the Department for visits.

When asked about whether he had been attending counseling, Richard responded, "Honestly the only thing that I know about any kind of counseling or anything is that I

11

was ordered to go to anger management. Complete that in lieu of any kind of counseling." He confirmed that he provided proof of completion of an anger management program to the Department, and he was unaware of any other counseling requirement.

Under cross-examination, when asked about the four drug tests he missed during the first reporting period—when he was participating in reunification services—Richard testified that he had been unable to call in on those days because he was working. When asked about his absence over the preceeding six months, Richard explained that he had been "basically homeless." He had been "[c]ouch surfing" during that time, an experience that was "definitely" in the past. He acknowledged missing drug tests, which he blamed on the lack of a telephone or transportation. When asked by counsel for the Department why, specifically, had he not contacted the Department for approximately six months, Richard responded, "I don't know how to answer that." When asked why he had not visited with Steven for six months, he responded, "I didn't have a phone. I didn't have transportation." And when asked what efforts he made to try to communicate the with Department or Steven, Richard acknowledged he made "none."

On redirect, Richard and his counsel engaged in the following exchange:

"Q:     Richard, is it safe to say based on your testimony that for a short period of time you just kind of dropped out for a little bit?

"A:     Correct.

"Q:     Why was that?

"A:     I gave up on myself. I'm not gonna lie. I was overwhelmed, you know. I had nothing. I guess you could say rock bottom. I had no place to go. No place to live. No phone. No food. You know what I mean?

"Q:     Right.

"A:     I just felt like I couldn't try any more.

"Q:     How long did that feeling last with you?

"A:     A good while. I mean I can't give you an exact date for how long but for awhile.

12

"Q: Maybe four or five months?

"A: At least.

"Q: How do you feel now?

"A: I feel like I'm the old me again. I feel, you know, I feel like I'm stepping out of the hole I was in. I mean I have a place. I have a job. You know.

"Q: Do you have a support system?

"A: Of course. The family that—my girlfriend's family, I should say, is 100 percent behind me. My boss is behind me. You know, he's a good guy. My girlfriend's father is a great guy. You know her sisters, they're a big part of it. I have a huge support system behind me now.

"Q: Are you committed toward working towards a stronger and stronger relationship with Steven?

"A: Of course, yes.

"Q: Would you like to see services continue for yourself?

"A: Yes."

The court then heard closing arguments. Counsel for the Department argued that Richard had received reasonable services but had failed to make reasonable efforts to participate in reunification, as evidenced by his six-month absence. Further, he contended, Richard's failure to participate and make substantive progress on his case plan was prima facie evidence that the return of Steven to his father's care would be detrimental. Noting that Richard blamed his absence on depression, counsel observed, "[P]arents often have issues in their lives. They're not allowed to drop out of a child's life and not even see him." His behavior, counsel submitted, was "just a demonstration of him either not being committed or just not being able to deal with the bare essentials of life taking care of children." With that, he requested the court terminate Richard's services.

Richard's counsel, on the other hand, argued that Richard had gone through a hard time: he lost his job, he lost his housing, and he "[t]emporarily lost his way." But since Richard reengaged, he had maintained contact with the Department. At the time of

13

hearing, he had stable housing. He had not resumed drug testing because he had been taken off the schedule. Prior to losing contact with the Department, he had regularly visited with Steven. In light of Richard's turnaround, counsel asked that the court extend services for an additional six months.

Counsel for Melissa echoed the Department's request that Richard's services be terminated. He argued that Richard had not been stable and consistent, and it was difficult to envision him reunifying over the next six months.

Counsel for Steven asked the court to "Give [Richard] this chance because I think if he does what he's supposed to do this will be beneficial for [Steven] who really is the reason that we are all here . . . ." She noted that Richard completed the anger management program, had never had a negative drug test, was in contact with the Department, and had a suitable home and stable employment. She empathized with his prior plight, stating, "He did explain that he was depressed. I think I would be too if I was in his circumstances. This isn't about me, but I think anybody who has lost not one job but apparently more than one, who essentially is homeless and never has been homeless before, whose whole life is changing might spiral downward." But looking at "what he's doing now and where his heart is at now," she believed Steven "would be far better off with two parents getting services." And, she queried, since Melissa was receiving six more months of services, "[w]here is the harm" in extending services for Richard?

At the conclusion of argument, the court expressed that it was "not unsympathetic" to Richard but that it had to follow the law, explaining:

"I understand that many people go through what you have gone through with or without children. Losing home. Losing jobs. Not knowing what to do and disappearing. That happens. I'm not unsympathetic to that. But what I have to look at is the fact that . . . [y]ou have a child in the system. And there are certain things that you have to do in order to basically end this case with a dismissal and the child gets to go back with the parents. I think someone said you're not allowed to disappear. Sure you are allowed to, but there are consequences too when you do that. I do not believe six months is a

14

relatively short period of time in a young child's life. That is a large chunk out of a three year old now four year old child's life where he doesn't have the benefit of seeing his father. And he may not be able to understand what it means to be homeless, not having a job, losing his phone. I'm glad that he is happy that you came back. And I'm glad that you came back. But I have to again look at the case and I have to follow the law. [¶] . . . But in this case I can't say that you weren't offered reasonable services because you were. What I can say is that you didn't use those services. And the most basic one, which is visiting your child whether you had a job or not, whether you did your counseling or not, I'm glad you did the anger management, but you didn't test. And that's true. But I'm looking at did you do the basic visits [with] your child. Because you tell me now that's what it's about, but for six months you didn't do that. You dropped out of his life. So you were provided reasonable services. Would it be a detriment to return the child to you? Well, I think it would be because there are so many unknowns. While I understand that when you did test they were negative there is a period of time almost not a year but close to a year where you didn't test. And that was even before you didn't have a cell phone. You didn't have a job. For some reason, I don't know what it was, the report seems to reflect there were four occasions where you did not test. Then after you lost your job and your cell phone and such you again didn't and they dropped you off of the schedule. And I would imagine the reason is why keep calling him in for testing if he's not interested. But at no time during that period did you come forward and say I'm here. I'm ready to test. It wasn't until May which is not too long ago. But that's an unknown. And the court has to look at that. And so because I don't know, and there has been no evidence about that, I just don't know if you're in the position where you're just—if you just happened to get lucky and you were testing at the time when you hadn't been using, or it wasn't in your system, or if you're not using, again an unknown. And the onus was on you to get into the department. Make contact and show, hey, I'm not using. That's not an issue for me. Not just to drop out.

"On the flip side if your intention is to prove there is a substantial probability that you would reunify, the problem with that is that again you haven't shown that. Certainly

15

you have a job and you have a place to stay, but I have to look at visits and no one has told me how to get around the fact that you did not visit with your son and still be within the confines of the law. That's one of the requirements that you consistently visited with your child and that just started happening. And I understand it's only been it was in the last month and a half. Nothing for six months. So I can't give you that extra six months because you have not shown the court through evidence and testimony that is the case that there is a substantial probability. There is no evidence to that effect. Largely because of the inconsistent visits. So I again I have to follow the law. It doesn't again mean that I'm not sympathetic. And it doesn't mean that your rights are terminated. You're still Steven's father. You can still make efforts outside of the department services to show that you are willing and able to have him back in your home. So you should be speaking with your attorney about that and finding out ways that you can demonstrate that. But at this time I'm going to follow the recommendation of the Department and terminate services to the father."

Richard filed a timely notice of appeal.

**Melissa's 18-Month Review**

Four months later, on November 21, 2013, the Department filed an 18-month review report recommending that the court terminate Melissa's reunification services and set a section 366.26 hearing, as she was no longer complying with most requirements of her case plan. At the 18-month review hearing, the court terminated reunification services for Melissa, and set a section 366.26 permanency hearing for April 3, 2014.

Richard petitioned for an extraordinary writ, arguing that the juvenile court erred by setting the permanency hearing while this appeal was pending. On March 5, 2014, we denied his petition on the merits. (*In re Steven P.*, A140550 [nonpub. opn.].)

## DISCUSSION

**Richard Did Not Forfeit His Right to Challenge the Court's Finding That the Department Provided Reasonable Services**

In his first of four arguments, Richard challenges the juvenile court's finding that the Department provided reasonable reunification services, contending the finding was

16

unsupported by substantial evidence. The Department disputes the merits of this claim, but also argues Richard forfeited his right to argue it on appeal by failing to object below to the sufficiency of the services.[6] Before turning to the merits, we address the forfeiture argument.

As a general rule, an appellate court will not consider a challenge to a ruling that could have been but was not raised in the trial court. (*In re S.B., supra,* 32 Cal.4th at p. 1293.) This forfeiture doctrine has been applied in dependency proceedings in a wide variety of contexts. (See *In re Dakota S.* (2000) 85 Cal.App.4th 494, 502 and cases there collected.) This, however, is not such a context.

At the 12-month review hearing, the Department bears the burden of establishing by clear and convincing evidence that it provided the parent reasonable reunification services designed to assist him or her in overcoming the problems that lead to the dependency proceeding. (*In re Precious J.* (1996) 42 Cal.App.4th 1463, 1472.) The court must find that the Department satisfied this burden before it can terminate services. (*In re K.C.* (2012) 212 Cal.App.4th 323, 329 ["If, at the 12-month hearing, [the department] does not prove, by clear and convincing evidence, that it has provided reasonable services to the parent, family reunification services must be extended to the end of the 18-month period."].) The parent's insufficient evidence challenge to a mandatory finding such as this is not forfeited by failure to object below. In other words, even if the parent does not contest the state of the evidence, he or she preserves the right to challenge it as insufficient to support a particular legal conclusion. (*In re Javier G.* (2006) 137 Cal.App.4th 453, 464 [mother did not forfeit her right to argue the Department did not make reasonable efforts to eliminate the need for removal of her child because a parent is not required to object to the Department's failure to carry its burden

---

[6] The Department actually argues that Richard waived this claim by failing to object below. It has repeatedly been clarified that waiver is the " ' "intentional relinquishment or abandonment of a known right," ' " while forfeiture refers to the "loss of a right based on failure to timely assert it . . . ." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2.)

of proof]; *In re Brian P.* (2002) 99 Cal.App.4th 616, 622–623 [a parent is not required to object to the agency's failure to carry its burden of proof]; see also *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17 ["contention that a judgment is not supported by substantial evidence . . . is an obvious exception to the [forfeiture] rule."].) The Department's forfeiture claim thus lacks merit.

While Richard did not forfeit his challenge by lack of objection below, the services he can challenge in this appeal are limited. He appeals from the 12-month review order, contending the services for that reporting period—in other words, from six months to 12 months—were unreasonable. This argument is timely. (§ 395.) He also challenges past conduct of the Department, claiming inadequacy of the initial case plan, and also identifying other alleged deficiencies pertaining to his substance abuse obligations during the first reporting period. The disposition and six-month review orders were both appealable orders. (§ 395.) Richard was obligated to appeal from those orders to challenge any purported wrong doings at those junctures. He did not do so, and his attempt to do so from the 12-month review order is improper. (*Steve J. v. Superior Court* (1995) 35 Cal.App.4th 798, 812 [father forfeited his right to object to the disposition and six-month review orders when he failed to challenge those orders until he appealed from the termination of his services at the 12-month review]; see also *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1151 ["an appellate court in a dependency proceeding may not inquire into the merits of a prior final appealable order on an appeal from a later appealable order . . . ."].) Thus, the only services we examine for adequacy are those offered—perhaps more accurately, not offered—during the second reporting period.

**The Juvenile Court's Finding at the 12-Month Review that the Department Provided Reasonable Services Was Unsupported By Substantial Evidence**

We review the juvenile court's finding of reasonable services for substantial evidence. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018; *In re Joanna Y.* (1992) 8 Cal.App.4th 433, 439.) We must determine whether there is any substantial evidence, contradicted or not, to support the court's conclusion. (*In re Katrina C.* (1988)

18

201 Cal.App.3d 540, 547.)  Substantial evidence is "evidence which is reasonable, credible and of solid value . . . ."  (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)  Applying this standard here, we conclude the juvenile court's finding that the Department provided Richard reasonable reunification services cannot stand.

Reunification services, which play a critical role in dependency proceedings, must be tailored to the particular needs of the family.  (§ 361.5; *In re Alanna A.* (2005) 135 Cal.App.4th 555, 563; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793.)  We thus judge the reasonableness of the Department's reunification efforts according to the circumstances of each case.  (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)  To support a finding reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . ."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  Richard points to the dearth of housing-related services as evidence that the Department failed to provide reasonable services in his case.  The record supports his contention.

The Department knew as far back as the time of jurisdiction that Richard did not have stable housing.  It observed in its jurisdiction report, "The father appears to move around frequently, change his telephone frequently, and has not had consistent employment history.  The father does not appear to be in a position to provide stability for Steven at this time."  The same was true at the time of disposition when, in its disposition report, it observed, "[T]he father understands that he does not have a home for Steven.  He wants to obtain appropriate housing, a stable and consistent job and support for his parenting."  Given this lack of suitable housing, the Department specified "[o]btain and maintain a stable and suitable residence for yourself and your child" as one of Richard's reunification objectives in his initial case plan.  Despite this, the Department

19

offered Richard no services during the first reporting period to assist him complete this component of his plan.

It is not surprising, then, that at the time of the six-month review Richard was still struggling to find suitable housing. As the Department described it in its six-month review report, "The father continues to struggle in finding a permanent place to live. The father has stated that his family is not willing to help him because his child is in the Child Welfare system. The father has lived in two different places this reporting period and will move again shortly. . . . The father has also stated that he is actively looking for an apartment to rent so that he can have a suitable and safe place for he and Steven to live in." And when it discussed Richard's compliance with the specific objectives of his reunification plan, the Department represented that Richard was in compliance with most of his objectives, except he was "Not in compliance" with the requirement that he obtain a "stable, safe, and sanitary place" to live with Steven.

Despite that housing was one of the few case plan requirements with which Richard had not complied at the time of the six-month review, the Department still offered him no assistance in finding housing during the second review period. Having identified lack of stable housing as an obstacle to reunification, the Department was obligated to "offer[] services designed to remedy [that] problem. . . ." (*In re Riva M.,* *supra,* 235 Cal.App.4th at p. 414.) There is no indication in the record that the Department referred Richard to a housing agency, offered to pay his first or last month's rent or deposit, or made any other similar attempt to help him find a suitable place to live. And it seems clear that he needed such assistance, as his downward spiral, apparently instigated by a job loss, was compounded by homelessness. In light of this record, we must conclude that the juvenile court's finding of reasonable services lacked sufficient evidentiary support.

While the lack of housing services alone supports our conclusion, we also agree with Richard's contention that the Department failed to provide him with reasonable transportation services, which might have enabled him to continue his visitations with Steven. In its July 26, 2012 disposition report, the Department acknowledged that

20

Richard did not have reliable transportation. Yet there is no indication in the record that it provided Richard with transportation assistance until nearly a year later (after Richard had lost and then resumed contact with the Department), when it finally provided him with a bus pass.

The Department's response to Richard's argument consists of this in its entirety: "Appellant complains that the services provided by the Department were legally insufficient because he was not offered housing or transportation assistance. As indicated in the Disposition Report, Appellant had a Section 8 housing voucher, [citation] and therefore was not in need of assistance in that regard. Regardless of whether Appellant lost his Section 8 housing voucher at some point in the process, a fact not disclosed in the record, he had the wherewithal to reapply for such, as he previously had successfully done so. In addition, Appellant was in fact provided bus passes to assist with his transportation issues [citation]. Appellant participated in his case plan [citation], argued for a modification of the plan at the disposition hearing [citation] and submitted to the amended plan at that time. Further, Appellant was advised at that and subsequent hearings that failure to comply with the reunification plan could result in termination of services. [Citations.] At no time did Appellant argue that he would be unable to participate in the plan because he needed bus passes and housing assistance."

The referenced passage in the disposition report explains that Richard had a section 8 housing voucher when he, Melissa, and Steven were still living together as a family—before the dependency proceeding commenced. Nothing in the record suggests that he had similar housing assistance at the time of the dependency. And dismissively—and presumptively—claiming that because Richard had apparently obtained a section 8 housing voucher some time in the past, he was fully capable of doing so again ignores the Department's fundamental duty to provide Richard with services to help him alleviate the obstacles to reunification, obstacles that unquestionably included housing. And as to the bus pass, this was not provided until May 2013, after Richard had fallen out of contact and then reengaged with the Department.

We note that at the 12-month review, counsel for Steven supported the continuation of services to Richard, asking the court to give him another chance because reunification would be beneficial for Steven. She noted that Richard completed the anger management program as required, had never failed a drug test, was back in contact with the Department, and had a suitable home and stable employment. She empathized with his prior plight, stating that she, too, would have been depressed if she had lost a job and become homeless. But looking at "what he's doing now and where his heart is at now," she believed Steven "would be far better off with two parents getting services." And, she queried, since Melissa was receiving six more months of service, "[w]here is the harm" in extending services for Richard? We are aware that the best interest of the child is not the issue before us, but we nevertheless believe that the opinion of the minor's counsel must count for something.

We are not unmindful that shortly after the six-month review hearing, Richard ceased participating in his case plan, dropping out of touch with the Department for over four months. Indeed, we are deeply troubled that when Richard encountered a difficult situation, he skipped out on his responsibilities—and his young son—rather than reaching out to the Department for help. But, this fact goes to the question of Richard's compliance with his case plan, an issue we do not reach given that Richard challenges the reasonableness of services provided by the Department.

We cannot know whether the outcome would have been different had the Department provided the services it had a duty to provide. Since Richard ceased participating in his reunification plan shortly after the six-month review, it is possible that no amount of services during the second reporting period would have enabled Richard to reunify with Steven. But, again, the question before us is not whether Richard availed himself of the services provided, but rather whether the Department provided those services in the first place. It did not.

In light of our conclusion, we need not reach the three alternative theories Richard asserts.

## DISPOSITION

The order terminating services is reversed with directions to afford Richard additional services unless new circumstances prevailing upon remand support a finding that services are unwarranted.  The order setting the section 366.26 permanency hearing for April 3 is vacated.

_____
Richman, J.

We concur:


_____
Kline, P.J.


_____
Haerle, J.